**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MICHAEL L. WHITTAKER,

    Plaintiff,

-vs-                                      Case No. 6:12-cv-98-Orl-28GJK

WELLS FARGO BANK, N.A.,

    Defendant,

and

NATIONWIDE INSURANCE COMPANY OF FLORIDA, C&N FOUNDATION TECHNOLOGIES, LLC, AMEC-BCI ENGINEERS & SCIENTISTS, INC., and JUDITH K. STEPHENS,

    Interpleader Defendants.

___

## ORDER

This case is before the Court on Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss Second Amended Complaint (Doc. 109). Plaintiff has responded to the motion. (Doc. 110). As set forth below, the motion is denied.

I. Legal Standard

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations'" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). In considering a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." LaGrasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

## II. Factual Background[1]

In October 2006, Plaintiff and his then-wife, Judith Stephens, executed a promissory note in favor of Wells Fargo in exchange for a mortgage loan of $190,837.00. (Second Am. Compl., Doc. 106, ¶¶ 9-10). The property was insured through a policy issued to Plaintiff by Nationwide Insurance Company of Florida, and Wells Fargo was listed as an additional loss payee or mortgagee on the insurance policy. (Id. ¶¶ 15-16). Stephens was not a named insured on the insurance policy, nor was she listed on the property deed as an owner of the property. (Id. ¶¶ 66-67).

In November 2010, the property suffered damage due to a sinkhole. (Id. ¶ 13). Based on estimates of the cost of repairing the property, in February and March 2011 the property insurer issued three checks totaling $222,999.24, jointly payable to Plaintiff and Wells Fargo. (Id. ¶¶ 19-20). Plaintiff contacted Wells Fargo and was told to endorse the

---

[1]The facts stated in this section are taken from the Second Amended Complaint (Doc. 106) and are accepted as true for the purpose of addressing the motion to dismiss that is now before the Court.

checks and send them to Wells Fargo's property loss department; Plaintiff did so. (Id. ¶¶ 21-22). Wells Fargo deposited the insurance proceeds by early April 2011. (Id. ¶ 23). Meanwhile, on or about February 25, 2011, Stephens and Plaintiff separated and Stephens established a separate residence in Land O'Lakes, Florida. (Id. ¶ 28).

In August 2011, C & N Foundation Technologies, LLC, a contractor engaged to work on foundation issues at the property, submitted its final invoice for $98,021.46 to the insurer and Plaintiff for its work on the repairs to the property. (Id. ¶¶ 18, 24). Plaintiff asked Wells Fargo to pay the invoice, but Wells Fargo withheld payment on the basis that it had not received "Conditional Waiver of Lien" and "Certification of Completion of Repairs" forms signed by Stephens. (Id. ¶¶ 25-26). According to Plaintiff, however, the mortgage did not condition disbursement of insurance proceeds on Wells Fargo's receipt of signed forms. (Id. ¶ 27). Another contractor submitted its final invoice for $9,629.60 to Plaintiff and the insurer on October 12, 2011, and on October 19, 2011, Plaintiff, through his attorney, sent a written request to Wells Fargo to disburse the insurance proceeds to pay the two outstanding invoices. (Id. ¶¶ 33, 35).

Instead of paying the invoices, however, Wells Fargo applied $175,857.19 of the insurance proceeds to repayment of the note—paying off the loan. (Id. ¶ 36). Wells Fargo sent Plaintiff a "Confirmation of Loan Payoff" dated October 25, 2011, and on October 26, 2011, Wells Fargo sent a check payable to Plaintiff and Stephens in the amount of $47,142.05—the difference between the insurance proceeds and the amount needed to satisfy the balance of the mortgage loan. (Id. ¶¶ 38-39). On November 8, 2011, Plaintiff's attorney sent Wells Fargo a second written request, asking that Wells Fargo reverse the

action on the loan account, restore the insurance proceeds to the account, and pay the repair invoices. (Id. ¶ 40). Wells Fargo responded in writing on December 7, 2011, declining to take the actions requested. (Id. ¶ 41).

Plaintiff filed this lawsuit on January 23, 2012. (Compl., Doc. 1). Only two claims now remain in this case—the two counts stated in the Second Amended Complaint (Doc. 106), which Plaintiff filed after the Court ruled on Wells Fargo's motion to dismiss Plaintiff's Amended Complaint. In Count One, Plaintiff alleges a violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., and in Count Two, Plaintiff alleges a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.

### III. Discussion

#### A. Count One

In Count One of the Second Amended Complaint, Plaintiff alleges that Wells Fargo violated RESPA by failing to comply with 12 U.S.C. § 2605(e), which provides that "[i]f any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20[2] days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." Id. § 2605(e)(1)(A). The statute also requires a servicer that receives a qualified written request ("QWR") to make appropriate corrections

---

[2] The statute has been amended since the date of Plaintiff's letter and now provides for a five-day response time instead of a twenty-day response period. (See Second Am. Compl. at 8 n.1). The prior version of the statute is quoted in the text.

to the account, provide a written explanation or clarification to the borrower regarding why the servicer believes the account is correct, or provide information requested by the borrower and the name of a contact person. Id. § 2605(e)(2).

In its prior motion to dismiss, Wells Fargo argued that the October 19, 2011 letter sent by Plaintiff's attorney did not constitute a QWR and that Plaintiff had not alleged a basis for damages under RESPA. In the Order on Wells Fargo's prior motion to dismiss, the Court concluded that the letter did constitute a QWR but—noting Plaintiff's concession of the point—found that Plaintiff had not adequately pleaded damages. (Order, Doc. 105). The Court dismissed the RESPA count without prejudice and with leave to amend so that Plaintiff could allege a basis for damages. (Id. at 10).

In its current motion, Wells Fargo does not challenge Plaintiff's pleading of damages but again contests the sufficiency of the RESPA claim with regard to whether Wells Fargo was obligated to respond to the October 19 letter. However, as argued by Plaintiff in his response memorandum, the cases cited by Wells Fargo in support of its position are distinguishable. Plaintiff has adequately pleaded a RESPA claim, including with regard to damages. Wells Fargo's motion to dismiss Count I is without merit.

B. Count Two

In Count Two, Plaintiff alleges that Wells Fargo violated TILA by not complying with 15 U.S.C. § 1666d, which provides:

> Whenever a credit balance in excess of $1 is created in connection with a consumer credit transaction through (1) transmittal of funds to a creditor in excess of the total balance due on an account, (2) rebates of unearned finance charges or insurance premiums, or (3) amounts otherwise owed to or held

>> for the benefit of an obligor, the creditor shall—
>
>> (A) credit the amount of the credit balance to the consumer's account;
>> (B) refund any part of the amount of the remaining credit balance, upon request of the consumer; and
>> (C) make a good faith effort to refund to the consumer by cash, check, or money order any part of the amount of the credit balance remaining in the account for more than six months . . . .

Plaintiff alleges that Wells Fargo violated § 1666d(C) because the transmittal of insurance proceeds to Wells Fargo created a credit balance in excess of $1.00 in Plaintiff's account, the credit balance remained in the account for more than six months, and Wells Fargo did not make a good faith effort to refund the credit balance. (Second Am. Compl. ¶¶ 61-69).

Plaintiff's § 1666d(C) allegations are twofold. First, he asserts that the issuance of a refund check in October 2011 payable to Plaintiff and Stephens was not a good faith effort to refund the balance because the check was not payable to Plaintiff as the sole insured under the contract of insurance. (Id. ¶ 69). Second, Plaintiff contends that after Wells Fargo refused to pay the contractors' invoices and held the credit balance for more than six months, Wells Fargo should have refunded all of the insurance proceeds—$222,999.24[3]—to him. (Id. ¶¶ 72-73). Wells Fargo raises several challenges to Plaintiff's TILA claim, and these are addressed in turn.

Wells Fargo first contends that § 1666d does not apply to a mortgage loan such as

---

[3]Plaintiff notes in a footnote of the Second Amended Complaint that Wells Fargo refunded $47,142.05 as part of the partial settlement of this case and that the actual balance that should have been refunded under TILA is $175,857.19.

Plaintiff's that is not an open-ended credit account—for example, a home equity line of credit or an unsecured line of credit. Wells Fargo cites cases discussing other sections of part D of TILA, but the Court is not persuaded that § 1666d applied only to "open end credit accounts" as urged by Wells Fargo. Section 1666d does not use the term "open end credit plan" as do neighboring statutory sections,[4] and at least one court has noted that implementing regulations trace the language of § 1666d with regard to both open-end credit, see 12 C.F.R. § 226.11, and closed-end credit, see id. § 226.21. See Kline v. Mortg. Elec. Registration Sys., Inc., No. 3:08cv408, 2011 WL 1233516, at *4 (S.D. Ohio Mar. 28, 2011). The Court does not read § 1666d as limited only to open-end credit accounts.

Wells Fargo next argues that even if § 1666d applies to Plaintiff's mortgage, the statute's requirements still do not apply to the circumstances of this case, even on the facts as alleged by Plaintiff. Wells Fargo contends that Plaintiff has not alleged that Wells Fargo applied the insurance proceeds to Plaintiff's mortgage loan account when they were transmitted to Well Fargo in April 2011. Thus, Wells Fargo argues, Plaintiff has not alleged that a credit balance was created by that transmittal of proceeds. This contention is rejected. Plaintiff has alleged that Wells Fargo "deposited the insurance proceeds on or before April 4, 2011," (Second Am. Compl. ¶ 23), and that at some point Wells Fargo applied some of those proceeds to pay off the mortgage loan balance, (id. ¶ 36). Plaintiff has adequately alleged that a credit balance was created in his account when the insurance

---

[4] See, e.g., 15 U.S.C. § 1666(d) (referring to "a creditor operating an open end consumer credit plan"); id. § 1666b (referring specifically to "open end consumer credit plan"); id. § 1666c (same). Section 1666d, on the other hand, refers to the broader term "consumer credit transaction."

proceeds were transmitted to Wells Fargo in April 2011.

Wells Fargo also argues that the transmittal of the insurance proceeds did not create a credit balance because under the terms of the mortgage,[5] Wells Fargo was authorized to hold the insurance proceeds during the time that the property was being repaired, and Wells Fargo characterizes the insurance proceeds as an "escrow item" under the mortgage. (Doc. 109 at 8 (citing ¶ 3 of mortgage)). Wells Fargo contends that the funds were held in an escrow account and not in Plaintiff's mortgage loan account. However, the Court cannot conclude that insurance proceeds are an "escrow item" within the paragraph of the mortgage cited by Wells Fargo; that paragraph lists which items are "escrow items," and insurance proceeds—as opposed to insurance premiums—are not among them.[6] And, while paragraph 5 of the mortgage does give Wells Fargo the right to hold insurance proceeds during the pendency of repairs, the Court has no evidence at this stage of the case as to where the insurance proceeds were deposited or held. The Court cannot conclude at this point that a credit balance was not created under the circumstances alleged.

Next, Wells Fargo argues that Plaintiff's allegations show that Wells Fargo issued a refund check to Plaintiff and Stephens in late October 2011—shortly after the six-month period would have elapsed even assuming that the April transmittal of insurance proceeds

---

[5]The mortgage is attached as Exhibit B to Plaintiff's original Complaint (Doc. 1).

[6]Paragraph 3 of the mortgage lists only the following "escrow items": "(a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums . . . ." Community association dues, fees, and assessments may also included as "escrow items" where applicable.

to Wells Fargo created a "credit balance" within the meaning of § 1666d. Wells Fargo asserts that the issuance of this refund check was a "good faith effort" to refund the credit balance, noting that Plaintiff has described Stephens as a "borrower" and thus a "consumer" within the scope of § 1666d. Wells Fargo further argues that to the extent that Plaintiff asserts that all of the insurance proceeds—not just the $42,142.05 difference between the loan payoff balance and the total—should have been refunded to him, he is seeking a windfall to which he is not entitled.

At the motion-to-dismiss stage of the case, the Court cannot conclude that Wells Fargo acted in good faith. Plaintiff has alleged that Wells Fargo refused to apply the insurance proceeds toward payment of the contractors' invoices and then unilaterally decided to apply the insurance proceeds to pay off the mortgage, on which payments were current.[7] Plaintiff has sufficiently alleged a § 1666d claim to survive Wells Fargo's motion

---

[7]With regard to property insurance and property loss, the mortgage provides:

> In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. **Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.** Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by

to dismiss.

## IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss Second Amended Complaint (Doc. 109) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida this \_\_\_4th\_\_\_ day of February, 2014.

                        JOHN ANTOON II
                        United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

---

Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. **If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.** . . .

(Mortgage ¶ 5) (emphasis added).  The Court has not been presented with any basis to conclude that restoration or repair was not feasible or that Wells Fargo's security was lessened. Nor is there any indication that Plaintiff and Wells Fargo agreed in writing that the insurance proceeds would not be applied to restoration or repair. And, in the October 19, 2011 letter sent by Plaintiff's attorney to Wells Fargo, the attorney reminded Wells Fargo of its right to inspect the property to ensure that work was completed. (Letter, Attach. to Second Am. Compl.). It is alleged that one week later, Wells Fargo informed Plaintiff that the loan had been paid off—using the insurance proceeds. (Second Am. Compl. ¶ 38).