# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MICHAEL L. WHITTAKER,**

    **Plaintiff,**

**-vs-**                                          **Case No. 6:12-cv-98-Orl-28GJK**

**WELLS FARGO BANK, N.A., et al.,**

    **Defendants.**

_____

# ORDER

This case is before the Court on the cross-motions for summary judgment[1] filed by

Plaintiff, Michael L. Whittaker, and Defendant Wells Fargo Bank, N.A.[2] As set forth below,

Plaintiff's motion is denied and Wells Fargo's motion is granted.

## I. Background

Sometime prior to October 2006, while unmarried, Plaintiff purchased a single-family

home ("the property") in Sanford, Florida. After Plaintiff married Judith Stephens, in October

2006 he and Stephens refinanced the mortgage on the property, executing a promissory

_____

[1]The pertinent filings are: (1) Plaintiff's Motion for Summary Judgment (Doc. 123) and
Wells Fargo's Response (Doc. 130) and (2) Wells Fargo's Motion for Summary Final
Judgment (Doc. 124) and Plaintiff's Amended Response (Doc. 129).    The Case
Management and Scheduling Order allows for the filing of replies to summary judgment
responses, (see Doc. 107 at 6), but neither movant filed a reply in this case.

[2]Claims involving other Defendants have already been resolved. Only the claims
discussed in this Order remain in the case.

note in favor of Wells Fargo in exchange for a mortgage loan of $190,837.00.[3] (See Note, Ex. 2 to First Doepp Aff., Doc. 125; Mortgage, Ex. 3 to First Doepp Aff.). Both Plaintiff and Stephens signed the Note and Mortgage, though Stephens signed the Mortgage as "non-vested spouse required to sign"; the deed to the property remained in Plaintiff's name alone, though on their mortgage application Plaintiff and Stephens indicated that title to the property was to be held in both of their names, (see Ex. 1 to First Doepp Aff., at 1). The property was insured against damage through a policy issued to Plaintiff by Nationwide Insurance Company of Florida, and Wells Fargo was listed as an additional loss payee or mortgagee on the insurance policy. Stephens was not a named insured on the insurance policy.

In November 2010, the property suffered damage that was eventually determined to have been caused by a sinkhole. (See, e.g., Composite Exs. 1, 2, & 3 to Pl. Aff. (Ex. A to Pl.'s Mot. Summ. J.)). Plaintiff made a claim to Nationwide for structural damage, and based on estimates of the cost of repairing the property, in February and March 2011 Nationwide issued three checks totaling $222,999.24, jointly payable to Plaintiff and Wells Fargo. (See Composite Ex. 5 to Pl. Aff.). Plaintiff notified Wells Fargo of the damage to the property, and on March 11, 2011, Wells Fargo sent a letter to Plaintiff and Stephens requiring, among other things, that the insurance checks be endorsed and sent to Wells Fargo. (March 11 Letter, Composite Ex. 4 to Pl. Aff.). Plaintiff endorsed the checks and sent them to Wells

---

[3]Wells Fargo attests that it sold the loan to Federal National Mortgage Association ("Fannie Mae") in December 2006 and thereafter acted only as the servicer of the loan. (First Doepp Aff., Doc. 125, ¶ 5). Plaintiff, however, denies that he was informed of the sale or transfer of the loan to Fannie Mae. (Pl. Supp. Aff., Doc. 129-1, ¶ 4).

-2-

Fargo's Property Loss department. Wells Fargo deposited the checks into a restricted escrow account, (see First Doepp Aff. ¶ 7), and the checks are reflected in Plaintiff and Stephens's monthly mortgage statement dated April 4, 2011, on which escrow deposits totaling $222,999.24 appear, (see Composite Ex. 5 to Pl. Aff.). Meanwhile, by February 25, 2011, Stephens and Plaintiff separated and Stephens established a separate residence in another city.

In August 2011, C&N Foundation Technologies, LLC ("C&N"), a contractor engaged to work on foundation issues at the property, submitted its final invoice for $98,021.46 to Nationwide and Plaintiff for its repair work. In several telephone conversations, Plaintiff asked Wells Fargo to pay C&N's invoice, but Wells Fargo declined to do so, asserting that Plaintiff and Stephens were required to sign certain documents before the insurance proceeds would be applied to C&N's invoice and that it had been unable to obtain Stephens's signature on those documents. (See Pl. Aff. ¶ 24; Answer, Doc. 115, at 7-8). Plaintiff told Wells Fargo that he and Stephens had separated and that she refused to sign any claim documents unless her name was added to the deed to the property. (See Pl. Dep., Doc. 127, at 63-64; Answer, Doc. 115, ¶ 30).

Another contractor, AMEC-BCI Engineers & Scientists, Inc. ("AMEC") submitted its final invoice for $9,629.60 to Plaintiff and Nationwide on October 12, 2011, (see Doc. 123-1 at 15 through 17). Plaintiff retained an attorney in mid-October 2011, and on October 19, 2011, the attorney sent a letter to Wells Fargo[4] on Plaintiff's behalf, enclosing the final

---

[4]The October 19 letter was sent by certified mail to Wells Fargo Home Mortgage at a P.O. Box in Baltimore, Maryland—the address provided in the mortgage for the sending

contractor bills and asking Wells Fargo to issue payment directly to the contractors. (Doc.

32-1). On October 25, 2011, Wells Fargo applied $175,857.19 of the insurance proceeds

to the loan balance—paying it off in full.[5] (See First Doepp Aff. ¶ 9; Loan History, Ex. 4 to

First Doepp Aff.). Wells Fargo sent Plaintiff and Stephens a "Confirmation of Loan Payoff"

letter dated October 25, 2011, (Ex. 8 to First Doepp Aff.),[6] and on October 26, 2011, Wells

---

of notices to Wells Fargo. (See Intagliata Aff., Ex. B to Pl.'s Mot. Summ. J., ¶ 2; Mortgage, Ex. B to Doc. 1, at 2 & 12). A duplicate of the letter was sent by regular mail to Wells Fargo's Property Loss Division in Springfield, Ohio—the address that Wells Fargo had provided Plaintiff in its March 11 letter regarding forwarding the endorsed insurance checks. (See Intagliata Aff. ¶ 2; March 11 Letter). The letter that was sent to Baltimore was returned as undeliverable. (See Intagliata Aff. ¶ 3 & Ex. B to Intagliata Aff.). As explained by Wells Fargo, that address "was previously a payment processing address for Wells Fargo [but] ha[s] been an invalid address since November 1, 2006." (First Doepp Aff. ¶ 11). However, the letter that was sent to Ohio was not returned, and it is undisputed that the letter was received by Wells Fargo in some manner and was scanned into its records; presumably the Ohio letter arrived at its destination and that is how Wells Fargo obtained it.

[5]With regard to property insurance and proceeds, the mortgage provides in part:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. . . . If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

(Mortgage, Ex. B to Doc. 1, at 7 ¶ 5).

[6]This letter began: "Congratulations! We are pleased to inform you that we have processed the funds necessary to pay your loan in full." (Ex. 8 to First Doepp Aff.). The Court doubts that these congratulatory remarks were received well by Plaintiff, as at that

Fargo sent Plaintiff and Stephens a check—payable to both of them—in the amount of $47,142.05—the difference between the amount of the insurance proceeds and the amount needed to satisfy the balance of the mortgage loan, (Ex. 9 to First Doepp Aff.).

On November 8, 2011, Plaintiff's attorney sent Wells Fargo another letter with the October 19 letter attached to it. (November 8 Letter, Comp. Ex. 8 to Pl. Aff.). In the November 8 letter, Plaintiff's attorney stated that he was writing "for the purpose of seeking correction of what [he] believe[s] was an error made by [Wells Fargo] in processing a request that [he] submitted to Wells Fargo by letter dated October 19, 2011." (Id. at 1). The letter asked that Wells Fargo reinstate the loan account, restore the insurance proceeds to the account, and pay the repair invoices as had been requested in the October 19 letter. (Id. at 2). On November 9, 2011, C&N filed in the Seminole County public records a Claim of Lien against the property in the amount of $98,021.46 based on its unpaid final invoice. (See Certified Copy of Claim of Lien, Ex. D to Pl.'s Mot. Summ. J.). On November 21, 2011, Wells Fargo recorded a Satisfaction of Mortgage in the property records of Seminole County, Florida. (See Ex. 14 to First Doepp Aff.).[7]

On November 28, 2011, Wells Fargo sent a letter to Plaintiff and Stephens (but not to Plaintiff's attorney) stating in part: "You recently contacted [Wells Fargo] regarding an inquiry about your mortgage loan. . . . I have attempted to contact you via telephone, [and]

---

point, the money that was to be used to repair his home had been applied toward another purpose.

[7]The Satisfaction of Mortgage states in part that "Wells Fargo Bank, N.A., is the owner and holder of a certain mortgage deed executed by" Plaintiff and Stephens. (See Ex. 14 to First Doepp Aff.).

-5-

as my last attempt to reach you on November 28, 2011 was unsuccessful I am providing you with the following information. . . . You may expect communication regarding the resolution of your inquiry to be provided by December 09, 2011." (November 28 Letter, Ex. 11 to First Doepp Aff.). Paula Kingery, an Executive Mortgage Specialist at Wells Fargo, signed the letter and provided a telephone number at which she could be contacted. (Id.). Record evidence submitted by both parties reflects that Kingery had telephone conversations with Plaintiff and with Plaintiff's attorney in late November and early December. (See Branch Dep., Doc. 126, at 20; Billing Records, Doc. 123-2 at 14; Pl. Dep. at 42-44; Servicing Process Notes, Ex. 13 to First Doepp Aff.).

On December 7, 2011, Kingery sent a letter to Plaintiff's attorney, with a copy to Plaintiff, stating that Wells Fargo "received correspondence regarding reinstatement of the above referenced loan. I have reviewed the information presented and would like to provide you with the details of my research." (December 7 Letter, Ex. 12 to First Doepp Aff., at 1). The December 7 letter explained that on October 25, 2011, Wells Fargo "applied funds from the insurance claim . . . to pay the mortgage loan in full" after attempts at obtaining Stephens's signature were unsuccessful and after Wells Fargo's Aged Claim Committee reviewed the loan. (Id.). The letter further explained that the Aged Claim Committee had instructed the Property Loss Department to pay off the mortgage and that the Property Loss Department had additionally reviewed the decision with the assistance of the legal department on October 18, 2011. (Id. at 1-2). The letter concluded by advising that the lien had been removed and that Wells Fargo "declines your request to reinstate the above referenced" loan. (Id. at 2).

Plaintiff filed this lawsuit on January 23, 2012, (Compl., Doc. 1), against Wells Fargo and four Interpleader Defendants—Nationwide, C&N, AMEC, and Stephens. In the Complaint and Amended Complaint, Plaintiff asserted five claims: Declaration of Rights against Wells Fargo and the Interpleader Defendants; violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., against Wells Fargo only; violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., against Wells Fargo only; breach of contract against Wells Fargo only; and interpleader against the Interpleader Defendants.[8]

Counterclaims and cross-claims were filed, but all of those claims, as well as all but two of Plaintiff's claims, have been resolved. Many of the parties' claims were settled during mediation in August 2012, and after mediation Plaintiff obtained a new mortgage loan from Wells Fargo in the principal amount of $125,001.00. (Pl. Aff. ¶ 17; HUD-1 Settlement Statement, Ex. 12 to Pl. Aff.). From the loan proceeds, $73,081.99 was used to pay C&N. (Pl. Aff. ¶ 17; HUD-1 Settlement Statement; Check, Ex. 13 to Pl. Aff.).

In February and March 2013, Plaintiff and Wells Fargo informed the court that they had settled all claims except for Plaintiff's claim to attorney's fees and costs. (See Status Reports, Docs. 74, 75, & 76). The parties requested a status conference, and a status conference was held on April 4, 2013, (see Mins., Doc. 84), during which it was contemplated that Plaintiff would submit a motion to approve settlement agreement. However, the parties remained unable to agree on attorney's fees, and they determined that

---

[8]The interpleader count was based on the check for $47,142.05 issued by Wells Fargo to Plaintiff and Stephens on October 26, 2011.

the claims that allow for an attorney's fee award—the RESPA and TILA claims—needed to be litigated. (See Doc. 98). At that point, a new case schedule was issued and motion practice resumed with regard to the RESPA and TILA counts, which are the only two counts of the Second Amended Complaint (Doc. 106). After Wells Fargo's motion to dismiss the Second Amended Complaint was denied,[9] (see Order, Doc. 111), the parties submitted the cross-motions for summary judgment that are now before the Court.

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission

---

[9]The Court had previously denied in part and granted in part Wells Fargo's motion to dismiss Plaintiff's Amended Complaint. (Order, Doc. 105). In that Order, the Court granted Plaintiff leave to amend the RESPA claim to properly plead damages.

to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1263 (D. Kan. 2003) (quoting Anderson, 477 U.S. at 251-52). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007). Such motions "'are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts." Id.

## III. Analysis

### A. Count I–RESPA

In Count One of the Second Amended Complaint, Plaintiff alleges that Wells Fargo violated RESPA—specifically, 12 U.S.C. § 2605(e)—by failing to timely and adequately acknowledge and respond to the October 19 letter sent by his attorney. At the time of the events at issue in this case, § 2605(e)(1), titled "Notice of receipt of inquiry," required that "[i]f any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the

correspondence within 20 days[10] (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A). And, § 2605(e)(2), titled "Action with respect to inquiry," required a servicer who receives a qualified written request ("QWR") to respond to the QWR within "60 days[11] (excluding legal public holidays, Saturdays, and Sundays)" of receiving the QWR and to provide the name and telephone number of a representative who could assist the borrower. Thus, subsection 2605(e) imposes two obligations on loan servicers—they must acknowledge receipt of a QWR within twenty days, and they must respond to the QWR within sixty days of receipt.

In order to succeed on a § 2605(e) claim, a plaintiff must show: (1) that the defendant is a servicer; (2) that the defendant received a QWR from the plaintiff; (3) that the QWR related to the servicing of the loan; (4) that the defendant failed to respond adequately to the QWR; and (5) that the plaintiff is entitled to actual or statutory damages. Echeverria v. BAC Home Loans Servicing, LP, 900 F. Supp. 2d 1299, 1305-06 (M.D. Fla. 2012), aff'd, 523 F. App'x 675 (11th Cir. 2013). In a prior Order, this Court concluded that the October 19 letter constitutes a QWR related to the servicing of the loan.[12] (Order, Doc. 105).

---

[10]Section 2605(e)(1)(A) has been amended since the date of Plaintiff's letter and now provides for a five-day period instead of a twenty-day period.

[11]Section 2605(e)(2) now provides for a thirty-day period instead of a sixty-day period.

[12]A QWR is defined as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that–(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

Additionally, Wells Fargo does not dispute that it was the servicer[13] of Plaintiff's loan or that it received the QWR. (See Doc. 124 at 1, 6; Doc. 130 at 4 & n.1). Thus, three of the five elements described in Echeverria are satisfied here. However, the parties dispute the remaining two elements. Wells Fargo asserts that it is entitled to summary judgment on Plaintiff's RESPA claim because Plaintiff cannot show that Wells Fargo's acknowledgment of or response to the QWR was untimely or inadequate and because Plaintiff suffered no damages "as a result of" Wells Fargo's alleged failure to comply with RESPA. Plaintiff, on the other hand, counters these assertions and argues for summary judgment in his favor on this claim.

### 1. Time of Receipt of the QWR

Although Wells Fargo acknowledges that it received the QWR, Wells Fargo contends that Plaintiff cannot establish when Wells Fargo received it and that therefore Plaintiff cannot possibly establish that Wells Fargo failed to timely respond to it. This argument is rejected.

In an affidavit filed in this case in July 2013, a Wells Fargo "Vice President Loan Documentation," Amanda Weatherly, attested that "[a]ccording to Wells Fargo's records, a letter dated October 19, 2011 from Attorney Raymond J. Branch on behalf of Plaintiff was

---

[13]Section 2605 defines "servicer" as "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2). "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." Id. § 2605(i)(3).

-11-

marked received by Wells Fargo on October 26, 2011." (Weatherly Aff., Doc. 94, ¶ 6).[14]

This affidavit establishes that Wells Fargo received the October 19 letter at least by October

26. Although Wells Fargo now attempts to create an issue as to when the letter was

received, these attempts are not well-taken in light of the Weatherly affidavit.[15] Thus, the

---

[14]Wells Fargo had submitted the October 19 letter—stamped "October 26, 2011"—with a motion to dismiss that it filed on March 29, 2012. (See Doc. 32-1). The letter had not been attached to Plaintiff's Complaint.

[15]The Weatherly affidavit was submitted by Wells Fargo in response to an earlier motion of Plaintiff–not the motion for summary judgment that is now before the Court. In its more recent summary judgment filings, Wells Fargo submitted affidavits of a different "Vice President Loan Documentation," Alissa Doepp. In her first affidavit, which was submitted in support of Wells Fargo's summary judgment motion, Doepp stated that "[o]n or before November 8, 2011, a letter from Plaintiff's legal counsel dated October 19, 2011 was received by Wells Fargo." (First Doepp Aff., Doc. 125, ¶ 11). In a second affidavit, which was submitted with Wells Fargo's opposition to Plaintiff's summary judgment motion, Doepp again stated that the October 19 letter was received on or before November 8, 2011, but added that "Wells Fargo has no record of receiving the October 19, 2011 letter prior to November 8, 2011." (Second Doepp Aff., Doc. 131, ¶¶ 5-6).

The same day that Wells Fargo submitted Doepp's second affidavit, Wells Fargo filed a "Notice of Withdrawal" (Doc. 132), noting that in his response to Wells Fargo's summary judgment motion Plaintiff had pointed out Weatherly's affidavit. Wells Fargo asserted in that Notice that Weatherly's affidavit "is arguably facially defective for failure to attach the business records referenced in it," (Doc. 132 ¶ 6), but conceded "that the statement in [Doepp's] supplemental affidavit that 'Wells Fargo has no record of receiving the October 19, 2011 letter prior to November 8, 2011' appears to conflict with the statement in the [Weatherly] affidavit that the QWR was 'marked as received by Wells Fargo on October 26, 2011,'" (id. ¶ 7). The Notice then stated: "To the extent this creates a conflict that cannot be resolved on summary judgment, Wells Fargo withdraws its arguments on the issue of Plaintiff's proof that Wells Fargo violated the statutory time requirements contained at pages 7-8 of its [summary judgment motion] and its arguments on the issues of Wells Fargo having no record of receiving the QWR prior to November 8, 2011, the October 26, 2011 date stamp, and the timeliness of Wells Fargo's acknowledgment of the QWR, contained at pages 6-8 of its [response memorandum]–without prejudice to presenting the arguments, and evidence thereon, at trial." (Id. ¶ 8).

Wells Fargo's half-hearted concessions and withdrawals on this point are troubling. Wells Fargo earlier submitted evidence acknowledging that it stamped the letter as received on October 26, 2011. It may not retreat from that acknowledgment at this point in the case

Court deems admitted receipt of the October 19 letter no later than October 26, 2011, for the purposes of summary judgment.

### 2. Timeliness and Sufficiency of Acknowledgment

Wells Fargo was required by RESPA to "provide a written response acknowledging receipt of the [QWR] within 20 days (excluding legal public holidays, Saturdays, and Sundays." 12 U.S.C. § 2605(e)(1)(A). As noted above, Wells Fargo has admitted receiving the October 19 letter no later than October 26. Counting twenty days from that date—excluding legal public holidays (Veterans Day (Friday, November 11) and Thanksgiving Day (Thursday, November 24)) and weekends—the twentieth day was Friday, November 25, 2011.[16]  Thus, Wells Fargo was obligated to "provide a written response acknowledging receipt of the correspondence" by November 25.

It is undisputed that the first written response from Wells Fargo was dated November

---

by submitting backpedaling affidavits and asserting that the earlier affidavit might be "defective." As stated in the text, the Court deems the letter received on October 26 based on Wells Fargo's own evidence and attestations.

[16]Curiously, in his summary judgment motion Plaintiff accurately states the statute's exclusion of legal holidays and weekends from calculation of the twenty-day period but then, in the very next sentence, argues that "[a]ssuming that [Wells Fargo] received the QWR on October 25, 2011, its acknowledgment of the QWR would have been due on November 14, 2011." (Doc. 123 at 9). Clearly, this computation includes—rather than excludes—weekends and holidays. In his response memorandum, Plaintiff provides alternative dates, stating that, using an October 26 receipt date, the twenty-day period would have run on "November 15, 2011 (or November 25, 2011 if counting business days only and not counting weekends or legal holidays)." (Doc. 129 at 3). The statute plainly excludes legal holidays and weekends, and no discussion of alternative dates including holidays and weekends is necessary. Moreover, inclusion or exclusion of weekends and holidays makes no difference to the determination of whether Wells Fargo's acknowledgment was timely in this case—as noted in the text, it is undisputed that no acknowledgment was sent until November 28, 2011.

28, 2011. (See Doc. 123 at 9; Doc. 130 at 7). This was one business day too late. Thus,

Wells Fargo did not acknowledge receipt of the October 19 QWR within the time period set

forth in RESPA.

Plaintiff additionally argues that the November 28 letter "failed to specifically

acknowledge receipt of the QWR" and "contain[ed] only a generalized reference to 'an

inquiry' [Wells Fargo] received from Plaintiff." (Doc. 123 at 9). However, the Court

concludes that Wells Fargo's November 28 letter is a sufficient acknowledgment of Plaintiff's

QWR. The November 28 letter provides in full:

> You recently contacted [Wells Fargo] regarding an inquiry about your
> mortgage loan. Addressing the concerns of our borrowers is vital to our
> success as a mortgage servicing company. I have attempted to contact you
> via telephone, [but] as my last attempt to reach you on November 28, 2011
> was unsuccessful I am providing you with the following information.
>
> I am the specialist who will be your single point of contact while you are
> working with our office. [Wells Fargo] regrets any frustration that you may be
> experiencing and I welcome the opportunity to assist you.
>
> You may expect communication regarding the resolution of your inquiry to be
> provided by December 09, 2011. Due to the escalated manner in which your
> inquiry was received, timelines are stringent. Your collaboration in gathering
> the required information to fully research your inquiry is essential to meet
> these timelines. Correspondence will be forwarded to your attention should
> any change in the expected resolution timeframe be experienced.
>
> If you have any additional questions or need clarification regarding the
> information provided in this letter, please contact me toll free . . . . I am
> available to assist you Monday through Friday, 9:00 a.m. to 6:00 p.m., Central
> Time.

(Ex. 11 to First Doepp Aff.).

Although Plaintiff challenges the sufficiency of the language "an inquiry," this letter

suffices under RESPA to acknowledge receipt of Plaintiff's QWR. Moreover, Plaintiff had

-14-

been in repeated telephone contact with Wells Fargo by this time and cannot with any vigor challenge that Wells Fargo was aware of his position and the nature of his concerns at the time this acknowledgment was sent. In sum, although the November 28 letter was an untimely acknowledgment of the October 19 QWR, it was a substantively adequate acknowledgment.

### 3. Adequacy of Response

Plaintiff also contends that even if Wells Fargo timely and sufficiently acknowledged the QWR, it failed to provide an adequate response as required by § 2605(e)(2). However, this argument is without merit.

Under RESPA, Wells Fargo was required, within sixty days of receiving the QWR, "and, if applicable, before taking any action with respect to the inquiry of the borrower," to:

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) information requested by the borrower or an explanation of

-15-

> why the information requested is unavailable or cannot be
> obtained by the servicer; and
>
> (ii) the name and telephone number of an individual employed
> by, or the office or department of, the servicer who can provide
> assistance to the borrower.

12 U.S.C. § 2605(e)(2). Wells Fargo sent a letter to Plaintiff's attorney dated December 7,

2011. That letter stated:

> [Wells Fargo] received correspondence regarding reinstatement of the above
> referenced loan. I have reviewed the information presented and would like to
> provide you with the details of my research.
>
> The Mortgage, signed by your client, provides that the lender shall have the
> right to hold insurance proceeds and that the lender may disburse proceeds
> for the repairs and restoration. Furthermore, if a lien which may attain priority
> over our security instrument is created, [Wells Fargo] may do whatever is
> appropriate to protect our interest in the property up to and including
> acceleration of the debt. As a result, pursuant to the loan documents, [Wells
> Fargo] may apply the insurance claim proceeds toward the payoff of the
> outstanding loan balance, including paying the loan in full.
>
> [Wells Fargo] applied funds from the insurance claim on October 25, 2011, to
> pay the mortgage loan in full. The funds that [Wells Fargo] applied [sic] in the
> amount of $175,847.19; an additional $4,064.24 from the escrow account was
> applied as well.
>
> [Wells Fargo] made several attempts to secure the Co-borrower's signature
> on the Contract and Waiver of Lien. These attempts started in March 2011
> and were continued through October 2011.  As the attempts were
> unsuccessful, the loan was sent for review to the Aged Claim Committee.
>
> The Property Loss Department was instructed by the Aged Claim Committee
> to pay off the mortgage, as the unsigned documents did not permit us to
> release funds to the contractor. An additional review of this decision was
> conducted by the Property Loss Department with the assistance of our Legal
> Department on October 18, 2011.  Our Legal Department affirmed the
> decision to pay off the loan with the claim funds.
>
> [Wells Fargo] has removed the lien, and the investor has been paid in full. At
> this time, [Wells Fargo] declines your request to reinstate the above

referenced [loan].

> If you have any additional questions or need clarification regarding the information provided in this letter, please contact me toll free at [telephone number and extension]. . . .

(Ex. 12 to First Doepp Aff.).

Plaintiff contends that "[a]n adequate response [under § 2605(e)(2)] in this case would have provided information relating to the subject of Plaintiff's inquiry, i.e. the use of the insurance proceeds to pay Plaintiff's contractors and the lack of any terms of the mortgage requiring borrowers to sign documents as a condition precedent to the release of insurance proceeds to pay contractors. . . . Neither of these issues is addressed by [Wells Fargo] in any response, whether timely or otherwise." (Doc. 123 at 9-10). However, the December 7 letter satisfies subparagraph 2605(e)(2)(B) because it "provide[s] the borrower with a written explanation or clarification that includes . . . a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer . . . and . . . the name and telephone number of an individual employed by . . . the servicer who can provide assistance to the borrower." Plaintiff does not specifically address the December 7 letter in the argument section of his summary judgment motion, but in the background section he stated: "By letter dated December 7, 2011, [Wells Fargo] responded to Plaintiff's attorney declining to reinstate the mortgage loan and **providing its reasons for applying the insurance proceeds in full satisfaction of Plaintiff's mortgage loan**." (Doc. 123 at 5 ¶ 29 (emphasis added); see also Pl. Aff. ¶ 14 (describing the December 7 in the same manner)).

In his response to Wells Fargo's summary judgment motion, Plaintiff argues that the

-17-

December 7 letter does not constitute a sufficient response under § 2605(e)(2) because it was not responsive to the inquiry in his QWR. (Doc. 129 at 5). Plaintiff contends that the December 7 letter did not provide information related to Plaintiff's request but instead only sought "to justify applying the insurance proceeds to pay Plaintiff's loan balance by citing a hypothetical situation"—that is, a situation where a lien might attain priority over the mortgage. (Id.). Although Plaintiff did not like the explanation he received from Wells Fargo, Wells Fargo did state why it believed that the action it had taken on Plaintiff's account with regard to application of the insurance proceeds was appropriate and correct. Such an explanation satisfies RESPA. The statute does not require the servicer to provide the resolution or explanation desired by the borrower; it requires the servicer to provide a statement of its reasons.[17] See, e.g., Bates v. JPMorgan Chase Bank, N.A., No. 13-15340, 2014 WL 4815564, at *6 (11th Cir. Sept. 20, 2014) (finding that servicer's response to QWR was sufficient under § 2605(e)(2)(B) where servicer provided reasons that the servicer believed the account was correct, regardless of whether borrower "was confused and/or unsatisfied with this answer").[18] Plaintiff's arguments go to whether Wells Fargo's action

---

[17]As correctly noted by Wells Fargo, § 2605(e)(2) provides three alternative ways—in subparagraphs (A), (B), and (C)—that a loan servicer can satisfy its response obligation. The servicer need not do all three. Here, Wells Fargo's response satisfied subparagraph 2605(e)(2)(B).

[18]In arguing that Wells Fargo's response did not satisfy RESPA, Plaintiff cites Allen v. Bank of America, N.A., 933 F. Supp. 2d 716 (D. Md. 2013), and Payne v. Mortgage Electronic Registration Systems, Inc. (In re Payne), 387 B.R. 614 (Bankr. D. Kan. 2008), but those decisions are distinguishable. In Allen, the servicer responded to a QWR by providing an account history but did not "provide[] a sufficient statement detailing why it believed the account was correct, as required by [RESPA]." 933 F. Supp. 2d at 733. Here, Wells Fargo did provide a sufficient statement of its reasons. And, in Payne, the debtors requested "their

were the appropriate actions under the terms of the mortgage rather than to whether Wells Fargo's letter explaining why it took those actions complied with RESPA. Because the December 7 letter does constitute a sufficient response to the QWR and was timely, Plaintiff's RESPA claim fails insofar as it alleges that Wells Fargo's response to the QWR was inadequate.

### 4. Damages

The final element of Plaintiff's RESPA claim is damages. For cases brought by individuals (as distinguished from class actions), RESPA provides that "[w]hoever fails to comply with any provision of [§ 2605] shall be liable to the borrower for each such failure in ... an amount equal to the sum of ... any actual damages to the borrower as a result of the failure; and ... any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of [§ 2605], in an amount not to exceed $2,000."[19] 12 U.S.C. § 2605(f)(1). Plaintiff has not alleged a "pattern and practice of noncompliance," nor do the facts of this case support the existence of any such pattern and practice. Thus, statutory damages are not at issue, and the only damages that Plaintiff can recover are his "actual damages."

---

current, correct, monthly escrow payment" but the servicer responded with "unexplained payoff letters containing an itemization." 387 B.R. at 638. In the case at bar, however, Wells Fargo's response addressed the issue raised in Plaintiff's QWR—application of the insurance proceeds—though the substance of that response did not sit well with Plaintiff.

[19]The statute also provides that "in the case of any successful action under [§ 2605]," a servicer is liable for costs and "attorney's fees incurred in connection with such action as the court may determine to be reasonable under the circumstances." 12 U.S.C. § 2605(f)(3).

Citing McLean v. GMAC Mortgage Corp., 595 F. Supp. 2d 1360, 1366 (S.D. Fla. 2009), Plaintiff argues that "actual damages" have been interpreted to include pecuniary damages such as "out-of-pocket expenses." (Doc. 123 at 10). In his summary judgment motion, Plaintiff claims that his out-of-pocket expenses "total \$105,595.33, including \$4,530.00 in pre-litigation attorney's fees."[20]  (Id.).  Plaintiff also asserts that he was damaged by an "unwanted impairment to his title" when C&N filed its claim of lien in the property records on November 9, 2011, though Plaintiff does not quantify this impairment. (See id.).

The damages that Plaintiff is now seeking, however, go far beyond what Plaintiff asserted in his pleadings. Plaintiff was given leave to amend his First Amended Complaint because, as he conceded at the time, he had not properly pleaded damages on his RESPA claim. (Order, Doc. 105, at 8). Plaintiff then filed his Second Amended Complaint, and in his RESPA claim he specifically pleaded as damages "out-of-pocket expenses totaling \$4,530.00 for pre-litigation legal fees to obtain a substantive response from" Wells Fargo. (Second Am. Compl. ¶ 53). No other damages were pleaded. Plaintiff may not now claim as damages items that he did not allege in the Second Amended Complaint, and the only damages claim that is properly before the Court is the \$4,530.00 in pre-litigation legal fees that was pleaded in the Second Amended Complaint.

In any event, Plaintiff has not established a causal connection between a RESPA violation and his pre-litigation attorney's fees or any of his late-asserted damages. As

---

[20]The remainder of the \$105,595.33 consists of payments allegedly made by Plaintiff to contractors who worked on repairs to the property.

concluded earlier, the only RESPA violation that Plaintiff has established is an untimely acknowledgment of his QWR; no connection between that untimeliness and any legal fees he incurred has been shown. Moreover, even if Plaintiff had established that Wells Fargo did not timely or adequately respond to the QWR, no connection has been established in that regard either.[21]  In his motion, Plaintiff only generally asserts a causal connection, and he refers broadly to his "[a]ffidavit and attached invoice statements" in support of his claim for damages. (Doc. 123 at 11). However, he has not explained how those invoices—even the attorney's fee billings—establish that Plaintiff incurred legal fees due to any RESPA violation rather than due to trying to convince Wells Fargo to take the action that he desired with regard to the insurance proceeds.[22]

In his response memorandum, Plaintiff asserts that he was damaged because Wells Fargo failed to respond to his QWR before applying the insurance proceeds to pay off the mortgage. (Doc. 129 at 7). But, Plaintiff has not challenged—or presented any evidence to impeach—Wells Fargo's explanation in the December 7 letter that the decision to apply the insurance proceeds to pay off the loan was both made and reviewed by October 18, 2011—before Plaintiff's attorney sent the October 19 QWR. And, even if Plaintiff had done so, the Court rejects Plaintiff's assertion that he was damaged by a late response rather than

---

[21]Legal fees for preparing the QWR itself are not recoverable as actual damages because they are necessarily incurred before the alleged RESPA violation occurred. See Tsakanikas v. JP Morgan Chase Bank N.A., No. 2:11-CV-888, 2012 WL 6042836, at *3 (S.D. Ohio Dec. 4, 2012).

[22]As noted by Wells Fargo, Plaintiff's attorney stated in his deposition that $4,530.00 was the total amount due on his legal bills to Plaintiff for the period prior to litigation. (See Branch Dep. at 7).

by the manner in which Wells Fargo chose to act with regard to the insurance proceeds.[23]

In sum, even though Plaintiff has established that Wells Fargo was late in acknowledging

his QWR, and even if he had established that Wells Fargo did not adequately acknowledge

or respond to it, the RESPA claim falls short due to a failure of proof as to a causal

connection between any RESPA violation and actual damages. Thus, as to Count I, Wells

Fargo's motion will be granted and Plaintiff's motion will be denied.

B. Count Two—TILA

In Count Two, Plaintiff alleges that Wells Fargo violated TILA by not complying with

15 U.S.C. § 1666d, which provides:

> Whenever a credit balance in excess of $1 is created in
> connection with a consumer credit transaction through (1)
> transmittal of funds to a creditor in excess of the total balance
> due on an account, (2) rebates of unearned finance charges or
> insurance premiums, or (3) amounts otherwise owed to or held
> for the benefit of an obligor, the creditor shall—
>
>> (A) credit the amount of the credit balance
>> to the consumer's account;
>> (B) refund any part of the amount of the
>> remaining credit balance, upon request of the
>> consumer; and
>> (C) make a good faith effort to refund to the
>> consumer by cash, check, or money order any
>> part of the amount of the credit balance remaining

---

[23]Plaintiff argues in his summary judgment response that "[a]s a result of [Wells Fargo's] taking the insurance proceeds, Plaintiff incurred additional legal fees for his lawyer to again notify [Wells Fargo] and have it reconsider its action, re-instate Plaintiff's mortgage and pay the contractors from the insurance funds." (Doc. 129 at 7). However, Plaintiff's damages, if any, were caused not by a RESPA violation but by Wells Fargo's handling of the insurance proceeds, which is not—and is not alleged to be—a RESPA violation in and of itself. Instead, that conduct was the focus of Plaintiff's breach of contract claim against Wells Fargo, which was resolved through settlement earlier in the case.

in the account for more than six months . . . .

Plaintiff argues that the $222,999.24 in insurance proceeds were "owed to" or "held for the benefit of" Plaintiff and that the deposit of insurance proceeds by Wells Fargo in March or April 2011 created a credit balance in excess of $1.00 in Plaintiff's account. And, Plaintiff contends that after six months had elapsed, Wells Fargo was obligated under TILA "to refund the insurance proceeds not being held for the purposes agreed to under the mortgage (i.e. for disbursement to the contractors for repairs to the property)." (Doc. 123 at 12). Plaintiff then makes arguments about what the mortgage obligated Wells Fargo to do with the insurance proceeds. (Id. at 12-15). Wells Fargo argues that TILA does not apply to it under the circumstances of this case because it was only the servicer of the loan rather than the "creditor" as stated in § 1666d. Additionally, Wells Fargo contends that no TILA violation occurred and that Plaintiff has not established a basis for damages suffered as the result of any TILA violation. The Court agrees with some, but not all, of Wells Fargo's assertions, but the points of agreement suffice to grant Wells Fargo's motion for summary judgment on this claim.

Wells Fargo first argues that it cannot be liable under TILA because it was only the servicer of the loan rather than the owner of the loan. However, as noted by Plaintiff, Wells Fargo meets TILA's definition of "creditor": "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence

of indebtedness . . . ." 15 U.S.C. § 1602(f). It is undisputed that Wells Fargo regularly extends credit within the terms of § 1602(f) and that the mortgage note was initially payable to Wells Fargo.[24] Moreover, Plaintiff has attested—and other evidence supports—that Wells Fargo held itself out as the owner of the loan to Plaintiff's detriment.[25] Thus, Wells Fargo is not entitled to summary judgment on the basis that it is not a "creditor" or "owner" of the loan.

Turning to application of § 1666d to the facts of this case, Plaintiff does not argue that Wells Fargo did not "credit the amount of the credit balance to the consumer's account under paragraph (A) or that he ever requested a refund of any part of the remaining credit

---

[24]Courts have noted difficulty with application of this definition and other provisions of TILA to issues involving owners, assignees, and servicers of loans. See, e.g., Vincent v. The Money Store, 736 F.3d 88, 107 (2d Cir. 2013) (noting that "[u]nlike most of TILA's provisions, which require creditors to make certain disclosures to debtors at the time of a loan's execution, section 1666d imposes obligations on creditors throughout the life of the loan" and that "we can think of no reason why Congress would require a credit balance in a consumer's account be refunded only if the balance was maintained by the original creditor and not a subsequent assignee") (internal citation of statutory sections omitted); Lucien v. Fed. Nat'l Mortg. Ass'n, Case No. 13-CV-62399, 2014 WL 2184934, at *2 (S.D. Fla. May 23, 2014) (noting "lack of clarity in the statute" and the resulting division in case law regarding servicer and creditor liability). However, this Court need not weigh in on this issue because Wells Fargo is otherwise entitled to summary judgment on this claim. In other words, Wells Fargo prevails regardless of whether it meets the definition of "owner" or "creditor" in this case.

[25]Plaintiff states in an affidavit that he was not notified that Wells Fargo had sold the loan to Fannie Mae. (See Pl. Supp. Aff. ¶ 4). Moreover, it appears that Wells Fargo remained the loss payee on the insurance policy. Further, the Satisfaction of Mortgage that Wells Fargo filed in the public records of Seminole County in November 2011 states that Wells Fargo is the owner and holder of the mortgage deed. (See Ex. 14 to First Doepp Aff.). And, throughout its motion papers Wells Fargo refers to "its status as the mortgage lien holder" and its "mortgage lien." (See Doc. 130 at 17). In light of this evidence, the Court cannot conclude at this stage of the case that Wells Fargo was not the owner of the loan or that it should not be estopped from asserting that it was not the owner.

balance under paragraph (B). (See Doc. 123 at 16 & n.4). Instead, Plaintiff relies on only paragraph (C) in attempting to establish a violation, arguing that Wells Fargo did not "make a good faith effort to refund to the consumer . . . any part of the amount of the credit balance remaining in the account for more than six months." However, Plaintiff's efforts to establish that Wells Fargo violated paragraph (C) fail.

First, the Court rejects Plaintiff's contention that a "credit balance" was created in April 2011 when the insurance checks were deposited into a restricted escrow account connected with the mortgage account. Such a deposit is contemplated and in conformity with the terms of the mortgage. Indeed, Plaintiff does not object to what Wells Fargo did with the insurance proceeds in April; instead, he challenges Wells Fargo's failure to pay the contractors when the final bills came due beginning in August 2011. Moreover, even assuming that a "credit balance" was created within the meaning of this section by the deposit of the insurance proceeds into a restricted escrow account, Wells Fargo did refund what remained of any such credit balance after six months as required by TILA. It is undisputed that Wells Fargo applied a large part of the proceeds toward payoff of the loan on October 25, 2011, and on October 26, 2011, Wells Fargo sent a check for the remainder to Plaintiff and Stephens. Plaintiff argues that Wells Fargo's "duty to make a 'good faith effort to refund to the consumer' the excess balance after 6 months would have been satisfied by [Wells Fargo] continuing to act as Plaintiff's agent in paying his contractors under the mortgage." (Doc. 123 at 16). However, TILA requires a refund to the consumer, and Plaintiff's arguments speak to Wells Fargo's obligations under the mortgage rather than its duties under this TILA provision.

Plaintiff additionally argues that Wells Fargo did not act in good faith when it paid the remaining insurance proceeds to him and Stephens jointly rather than solely to him. However, as a matter of law, lack of good faith is not supported here. TILA refers to the "consumer's account," and here the account belonged to both Plaintiff and Stephens—not just Plaintiff. Although the insurance checks were initially payable to Plaintiff and Wells Fargo rather than to Plaintiff, Stephens, and Wells Fargo, the refund to Plaintiff and Stephens cannot be said to not have been made in good faith. Such a refund was a refund "to the consumer" under TILA; both Plaintiff and Stephens were the consumers to whom credit was extended.

Finally, even if Plaintiff's TILA claim did not otherwise fail, Plaintiff has not presented evidence of damages resulting from a TILA violation. The damages that Plaintiff seeks—refund of $229,999.24 in insurance proceeds to him, less $47,142.05 already received—are damages allegedly arising from Wells Fargo's application of the loan proceeds to pay off his mortgage loan, not damages arising from failure to act appropriately with regard to a "credit balance" under § 1666d. In sum, Wells Fargo is entitled to summary judgment on Count II.

## IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. 123) is **DENIED**.

2. Wells Fargo's Motion for Summary Final Judgment (Doc. 124) is **GRANTED** as to both claims in the Second Amended Complaint (Doc. 106).

3. All other claims having previously been resolved, the Clerk is directed to enter a

-26-

judgment providing that Plaintiff takes nothing on his claims against Wells Fargo Bank, N.A.,

under the Real Estate Settlement Procedures Act and the Truth in Lending Act. Thereafter,

the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, this ___ day of October, 2014.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party